United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABRAHAM SOLIS,
Plaintiff,
v.
CLEAN HARBORS, INC., et al.,
Defendants.

Case No. 20-cv-02660-AGT

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 35

Abraham Solis, a temporary contract employee of Aerotek, Inc., was assigned to Clean Harbors Industrial Services, Inc. ("Clean Harbors") to work as a Field Technician. On the first day of his Clean Harbors assignment, Solis was injured while performing maintenance work on heavy machinery at Clean Harbors's Benicia, California facility. After Solis began receiving workers' compensation benefits from Aerotek, he brought this negligence action against Aerotek and Clean Harbors, seeking further recovery for the same injury. Defendants now move for summary judgment on the basis that California's Workers' Compensation Act provides Solis's excusive remedy for his workplace injury. For the reasons that follow, Defendants' motion is granted.

## I. BACKGROUND

### A. The Parties and Their Relationships

Clean Harbors is an environmental and industrial services provider with customers and locations throughout the United States. ECF No. 37, Tobin Decl. ¶¶ 3–4. In December 2017, Clean Harbors entered into a Master Services Agreement ("MSA") with Aerotek, a temporary staffing agency, in which Aerotek agreed to provide temporary contract employees to work "under [Clean Harbors's] management and supervision at a facility or in an environment controlled by

[Clean Harbors]." ECF No. 36, Peterson Decl. ¶¶ 3–4; ECF No. 36-1, MSA § 2.1.[1] Under the MSA, Aerotek also agreed to "provide any salary or other benefits" to its contract employees, to "make all appropriate tax, social security, healthcare, and other withholding deductions and payments," and to provide workers' compensation coverage. MSA § 3. For its part, Clean Harbors had "responsibility to control, manage and supervise the work of the Contract Employees assigned to [Clean Harbors] pursuant to [the MSA]."[2] *Id.* § 2.2. Clean Harbors could also terminate the assignment of any contract employee with notice to Aerotek. *Id.* § 12.

In 2019, Clean Harbors utilized Aerotek's temporary contract employees, in addition to its own permanent employees, to provide services to its customer, Shell Oil Company, at Shell's oil refinery in Martinez, California ("Martinez refinery"). Tobin Decl. ¶¶ 4–5. Some of these contract employees had the job title Field Technician. *Id.* ¶ 5. Before sending the Field Technicians to the Martinez refinery, Clean Harbors provided them with a day of training at its facility in Benicia, California. *Id.* ¶ 6.

Solis was a temporary contract employee hired by Aerotek to work for Clean Harbors as a Field Technician at the Martinez refinery. *Id.* Solis completed Aerotek's online onboarding paperwork for the Clean Harbors assignment in December 2018. *See* ECF No. 36-3, Cal. Lab. Code § 2810.5 Notice to Employee;[3] ECF No. 36-4, Employment Agreement. Solis's Aerotek employment agreement stated that he was an employee of Aerotek, not Clean Harbors, and that his employment with Aerotek was "co-extensive" with the Clean Harbors assignment—that is, his Aerotek employment would begin on the first day of his Clean Harbors assignment, and end "if and when" his assignment was ended by Clean Harbors or otherwise. *Id.* §§ 2, 14; *see also id.* § 1 ("this offer of temporary employment with Aerotek[] is subject to final approval by [Clean

---

[1] The MSA defines "Contract Employee" as "an Aerotek employee temporarily placed with [Clean Harbors] pursuant to th[e] Agreement." MSA at 1.

[2] The MSA stated that Aerotek contract employees were to "perform only the duties and functions of the specific jobs set forth on Exhibit A." MSA § 2.1. The job positions listed in Exhibit A include Field Technician, General Labor, Warehouse, and Equipment Mechanic/Maintenance, among others. *Id.*, Ex. A.

[3] Aerotek's Notice to Employee form lists Aerotek as the "Hiring Employer" and Clean Harbors as "the other entity for whom [Solis] will perform work." Notice to Employee at 1.

Harbors]"). It also included a provision stating that Aerotek "provides workers' compensation coverage for things such as on-the-job injuries . . . incurred while on Assignment for Aerotek[], and to the extent permitted by law, you agree to look solely to Aerotek, Inc. and/or its insurer for damages and/or expenses for any such claims." *Id.* § 17. And Solis testified that he understood Clean Harbors could end his assignment at any time. ECF No. 40-1, Solis Dep. at 21:16–20.

**B. Solis's Workplace Injury**

On the afternoon of January 15, 2019, the first (and ultimately last) day of Solis's Clean Harbors assignment, Solis's right thumb was crushed by heavy machinery that fell off a forklift at Clean Harbors's Benicia facility. Solis had reported to the Clean Harbors facility that morning at 9:00 a.m., per Aerotek's instructions, expecting to undergo a day of Field Technician training. ECF No. 44, Solis Decl. ¶¶ 4–5. When he arrived, however, Solis was told that Clean Harbors "didn't have the training ready," Solis Dep. at 29:19–21, and so instead, a Clean Harbors employee "who appeared to be in charge of the facility" sent him to work in the maintenance warehouse area, ECF No. 6, Compl. ¶ 10. There were no Aerotek personnel present on Clean Harbors's premises that day. ECF No. 40-2, Clean Harbors's Resp. Solis's Interrog. 13; Solis Dep. at 25:16–23.

When Solis got to the maintenance area of the Benicia facility, he received an oversized bodysuit and signed Clean Harbors's Job Safety Analysis ("JSA") form for an unspecified "maintenance & repair" activity to be performed that day. Tobin Decl. ¶ 7; ECF No. 37-1, JSA; Solis Dep. at 39:5–42:15, 44:21–45:7. Solis testified that he "wasn't given any real clear direction on what to do" in the maintenance area, so he "just kind of waited around" until departing for lunch shortly before noon. Solis Dep. at 33:13–19.

When Solis returned from lunch an hour later, several Clean Harbors employees summoned him to help with a maintenance activity involving a large, industrial centrifuge machine. *Id.* at 35:21–37:20. Solis complied, and following the Clear Harbors employees' directions, he proceeded to help them place and align metal disk plates underneath the centrifuge machine while it was lifted off the ground by a forklift. *Id.*; *see* Compl. ¶¶ 14–15, 17–18. During this process, "the forklift instantaneously dropped the upper piece of machinery without any

warning, causing it to come crashing down on [Solis's] hand, [] immediately amputating and crushing his [right] thumb." Compl. ¶ 19. Solis went into shock and was transported to the hospital where doctors performed emergency surgery on his injured hand. *Id.* ¶ 20. Solis has not returned to work for Clean Harbors since. *Id.* ¶ 26.

Shortly after the accident, Solis filed a workers' compensation claim with Aerotek. Solis Dep. at 52:1–3. He began receiving workers' compensation through Aerotek on January 18, 2019, and he continues to receive such benefits. ECF No. 40-5, Solis's Resp. Defs.' Interrog. 2; ECF No. 39, Park Decl. ¶¶ 6–8.

### C. This Lawsuit

In March 2020, Solis filed a single-count negligence complaint against Aerotek and Clean Harbors in Contra Costa County Superior Court. After removing the case to this Court, Aerotek and Clean Harbors answered the complaint, and as an affirmative defense alleged that Solis's exclusive remedy for his workplace injury is governed by California's Workers' Compensation Act, Cal. Lab. Code, § 3600 et seq. ("WCA"). ECF Nos. 16, 17. In July 2020, after the parties agreed at the initial case management conference that the workers' compensation exclusivity defense is potentially dispositive, the Court issued a scheduling order limiting initial discovery and dispositive motions to the issue of whether the WCA's exclusive remedy rule bars this action. ECF No. 28. Defendants now seek summary judgment on the ground that it does. ECF No. 35.

## II. DISCUSSION

### A. Workers' Compensation Exclusive Remedy Rule

Under the WCA, an employer is liable without regard to negligence "for any injury sustained by [its] employees arising out of and in the course of the employment." Cal. Lab. Code § 3600(a). The injured employee, in turn, is generally barred from pursuing any tort remedies against the employer that would otherwise apply—when workers' compensation is available, it is the employee's "sole and exclusive remedy" against the employer. *Id.* § 3602(a). The basis for the exclusive remedy rule is "the presumed 'compensation bargain' in which the employer assumes liability for injury or death arising out of and in the course of employment without regard to fault and compensation is relatively swift, in exchange for limitations on the amount of

liability." *Angelotti v. The Walt Disney Co.*, 192 Cal. App. 4th 1394, 1403 (2011) ("The Workers' Compensation Act must be liberally construed for the purpose of extending benefits to persons injured in their employment.") (citation omitted).

Importantly, an employee may have more than one employer for purposes of workers' compensation. *Id.* "Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or 'general' employer and a second, the 'special' employer." *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 174 (1979) (en banc) (citation omitted). When a dual employment relationship exists, both employers are responsible for providing workers' compensation benefits, and both are protected by the WCA's exclusive remedy rule. *Angelotti*, 192 Cal. App. 4th at 1403; *see Riley v. Sw. Marine, Inc.*, 203 Cal. App. 3d 1242, 1248 (1988) ("In this dual employer situation, the employee is generally limited to a statutory workers' compensation remedy for injuries he receives in the course of his employment with the special employer; he may not bring a separate tort action against either employer.").

Here, Aerotek and Clean Harbors argue that the undisputed facts demonstrate (1) that they were Solis's joint employers for workers' compensation purposes—Aerotek was Solis's "general" employer and Clean Harbors his "special" employer—and (2) that Solis's workplace injury arose out of and in the course of his employment with Aerotek at Clean Harbors. ECF No. 35 at 6. Solis counters that Aerotek was his only employer at all relevant times and argues that, at a minimum, "a triable issue of fact" exists as to whether Clean Harbors was his special employer at the time of his injury. ECF No. 42 at 15. Solis further argues that he was not performing a duty within the scope of his employment when he was injured, and that other exceptions to the WCA's exclusive remedy rule apply and require denial of Defendants' motion for summary judgment. *Id.* at 8–9.

**1. Clean Harbors was Solis's Special Employer**

Solis does not dispute that Aerotek, which paid his workers' compensation claim, was his general employer at the time of his injury. He instead disputes that Clean Harbors was his special employer and argues that the evidence creates a triable issue of fact requiring resolution by a trial.

The Court disagrees.

Usually, the existence of a special employment relationship is a question of fact reserved for the jury. *Wedeck v. Unocal Corp.*, 59 Cal. App. 4th 848, 857 (1997). "However, if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists becomes a question of law which may be resolved by summary judgment." *Id.* "In determining whether a special employment relationship exists, the primary consideration is whether the special employer has '[t]he right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not[.]'" *Kowalski*, 23 Cal. 3d at 175 (citation omitted); *see also Brassinga v. City of Mountain View*, 66 Cal. App. 4th 195, 215 (1998) ("The key to the existence of a special employment relationship is control."). The right to discharge is also "strong evidence of the existence of a special employment relationship." *Kowalski*, 23 Cal. 3d at 177. Other "secondary factors" relevant to the special employment inquiry include who supplied the work tools and place for performance, "whether the employee is performing the special employer's work," whether there was an agreement between the original and special employer, "whether the employee acquiesced in the new work situation," who was obligated to pay the employee, and the length of employment. *Wedeck*, 59 Cal. App. 4th at 860 (affirming summary judgment in favor of special employer on workers' compensation exclusivity where the undisputed evidence on the "primary" factor of right to control, and a "great majority of the secondary factors," established the existence of a special employment relationship).

Here, Defendants have met their burden of establishing, and Solis has raised no genuine issue of material fact disputing, that Clean Harbors was Solis's special employer. It is well-established that the special employment doctrine applies to the "labor brokerage situation" presented in this case—i.e., where a temporary staffing agency (Aerotek) assigns its contract employee (Solis) to temporarily work for another business (Clean Harbors)—"and bars an employee who is injured while on assignment from a labor broker . . . from bringing a tort suit against the assigned employer." *Riley*, 203 Cal. App. 3d at 1251 (collecting cases). Indeed, "in cases such as this where the general employer is a temporary employment agency . . . and the

business to which the employee is assigned has the right of supervision and direction of the employment duties, the typical result is to find the existence of a special employment relationship." *Santa Cruz Poultry, Inc. v. Superior Ct.*, 194 Cal. App. 3d 575, 579 (1987). Nothing in the record supports deviating from that typical result.

The undisputed facts demonstrate that Clean Harbors had the right to, and did, control and direct Solis's work activities. While Solis claims that "it appears [] Aerotek had the exclusive right to control [his] job duties," ECF No. 42 at 20–21, this unsupported assertion is plainly contradicted by the record. To start, the MSA between Aerotek and Clean Harbors—which Solis acknowledges made his "work with Aerotek and [Clean Harbors] possible," *id.* at 24–25—gave Clean Harbors the "responsibility to control, manage and supervise" Solis's work, as well as the right to terminate his assignment at will. MSA §§ 2.2, 12. It similarly directed that Aerotek's contract employees such as Solis would "provide services under [Clean Harbors's] management and supervision at a facility or in an environment controlled by [Clean Harbors]." *Id.* § 2.1. That is exactly what happened here. *See Caso v. Nimrod Prods., Inc.*, 163 Cal. App. 4th 881, 889 (2008) ("Although the terms of a contract may specify that a special employer retains the right to control the details of an individual's work . . . 'the terminology used in an agreement is not conclusive[.]' There still must be evidence to support the inference to be drawn from the contract terms.") (quoting *Kowalski*, 23 Cal. 3d at 176).

During Solis's short time at Clean Harbors's Benicia facility on January 15, 2019, he interacted exclusively with, and was solely supervised, directed, and controlled by, Clean Harbors personnel; he did not perform any work on his own initiative, under the supervision of Aerotek, or without direction from Clean Harbors employees.[4] When Solis arrived at Clean Harbors's premises that morning, a Clean Harbors employee sent him to work back in the facility's maintenance area where he was issued an oversized bodysuit. After lunch, Clean Harbors employees in the maintenance area asked Solis to help with maintenance work on the centrifuge

[4] There is no dispute that Aerotek did not provide ongoing direction to Solis; after sending him to Clean Harbors, at no point did Aerotek purport to instruct Solis on how he should carry out his work activities.

United States District Court
Northern District of California

machine and Solis complied. The Clean Harbors employees gave Solis directions as they worked on the machinery—including telling him "to pull down on the road blocks [] underneath the centrifuge machine," and to place the metal disks "on top of the blocks," and "to make sure that [the disks] were aligned correctly," Solis Dep. at 36:17–23—and Solis was following those directions immediately prior to the accident, *see id.* at 38:11–16. Aerotek had no presence at the Benicia facility that day. And Solis understood that Clean Harbors could terminate his assignment at any time. *See Kowalski*, 23 Cal. 3d at 177 ("Evidence that the alleged special employer has the power to discharge a worker 'is strong evidence of the existence of a special employment relationship.'") (citation omitted).

Solis attempts to refute Clean Harbors's supervision and control at the time of the accident by characterizing the Clean Harbors employees' directions as mere requests "for help." ECF No. 42 at 18. Yet his signed declaration attests that he "was *directed to perform services* for which [he] was not trained" regarding the centrifuge machine, Solis Decl. ¶¶ 5, 12 (emphasis added), and his deposition testimony cited above shows that the Clean Harbors employees controlled the actions he took to service the centrifuge machine.[5] *See Santa Cruz Poultry*, 194 Cal. App. 3d at 582 ("[W]here . . . the alleged special employer was, by the admission of plaintiff, exercising direct supervision over the exact task during the accomplishment of which an employee is injured, the status of special employer must be found to exist as to a claim for that injury.") (citation omitted). Solis also argues "there was no supervision by a foreman or other [Clean Harbors]

[5] Notably, Solis's complaint also contains detailed allegations describing the specific "instructions" and "directions" he received from the Clean Harbors employees as they worked on the centrifuge machine. *See, e.g.*, Compl. ¶ 15 ("One [Clean Harbors] employee directed [Solis] to climb on top of the centrifuge machine."); ¶ 17 ("[An]other [Clean Harbors] employee instructed [Solis] to pull down on a large rubber block that was underneath the centrifuge machine with his bare hands, and then place the round metal disk plates on top of the rubber blocks and to make sure it was aligned correctly."); ¶ 18 (Solis "complied with the other employees' and was given directions to align the pins with the holes in between the machinery on one side of the machine" and "once the pins were aligned [Solis] was asked to clear way and watch the forklift drop the upper attachment down once his job was complete," and he "then moved to the other side of the machine at the direction of the other two [Clean Harbors] employees in order to complete the same task"); ¶ 19 ("the [Clean Harbors] employee across from [Solis] instructed him to make sure the round metal disk was aligned correctly" and "[a]t this point [Solis] wasn't given any instruction to step back from underneath the load" and "the forklift instantaneously dropped the upper piece of machinery" on Solis's hand).

employee who was 'in charge' [] of Solis at the time that he was injured," ECF No. 42 at 21, but the deposition testimony Solis cites to support this assertion indicates only that he did not know the names, positions, or job titles of the Clean Harbors personnel he interacted with that day, *see* Solis Dep. at 33:9–38:23. In any event, what is relevant is Clean Harbors's *right* to control and not whether that right is *exercised*. *Wedeck*, 59 Cal. App. 4th at 859 ("[C]ontrol need not be exercised. It is sufficient if the right to direct the details of the work is present."). The undisputed facts show that Clean Harbors had the right to control and direct Solis's work.

Several of the secondary factors also support the conclusion that Clean Harbors was Solis's special employer: Solis performed Clean Harbors's work on Clean Harbors's machinery at Clean Harbors's facility using Clean Harbors's equipment; Aerotek and Clean Harbors had an agreement (the MSA) that Clean Harbors would supervise and control Solis's work; and Solis accepted the assignment at Clean Harbors and acquiesced in the new work situation by submitting to Clean Harbors's control and direction.[6] While Aerotek retained responsibility for payment of wages, this factor is not determinative, "particularly in the labor brokerage context where the general employer often handles administrative details, including payroll." *Wedeck*, 59 Cal. App. 4th at 861 & n.8. And although Solis was on the job for only a few hours before his injury, the short duration of his employment is not dispositive.[7] *See Santa Cruz Poultry*, 194 Cal. App. 3d at 577 (finding special employment relationship despite employee's assignment being "for one day only," employee being on general employer's payroll, and employee having "the option of refusing any work assignment").

Finally, the fact that Solis's Aerotek employment agreement identified him as an employee

[6] Solis argues that he did not agree to a special employment relationship with Clean Harbors. ECF No. 42 at 14. However, "consent to the special employment relationship is normally implied, by the weight of authority, from acceptance of the special employer's control." *Santa Cruz Poultry*, 194 Cal. App. 3d at 581–82. As noted, Solis's acts immediately prior to the accident show that he submitted to the direction and control of Clean Harbors.

[7] Solis's employment agreement with Aerotek did not specify the length of his Clean Harbors assignment, just that it would be for "a temporary period." *See* Employment Agreement at 1 ("Aerotek[] conditionally offers to employ Abraham D. Solis in the capacity of Field Technician commencing on 01/07/2019 at [Clean Harbors] for services with the latter for a temporary period, to perform such duties and for such hours of work as may be assigned to [Solis] during the term of service (the 'Assignment').").

of Aerotek and not Clean Harbors does not, as Solis argues, "create[] a triable issue of fact on its own with respect to Solis's job status at the time of []his injury." ECF No. 42 at 7. The MSA's disclaimer of any employment relationship between Clean Harbors and Aerotek's contract employees does not raise a triable issue, either. This is because "the reality of the employment relationship, not the parties' paper agreement, controls the parties' rights." *Santa Cruz Poultry*, 194 Cal. App. 3d at 581; *see Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018) ("[A] contract cannot alter the truth of an employment relationship by placing parties in different positions from those they actually held."). The actual conduct of the parties, as discussed above, demonstrates that Clean Harbors was Solis's special employer. That Solis "distinctly believed [] he was only employed by Aerotek," ECF No. 42 at 21, does not change the result; the special employee inquiry is objective. *Cruz*, 910 F.3d at 1268 (finding that employee's "signed declaration that she subjectively considered herself a Tradesmen employee is insufficient to put the matter in controversy: the borrowed employee inquiry is objective").[8]

In sum, the undisputed facts demonstrate that a special employment relationship existed between Solis and Clean Harbors. Thus, Solis's evidence that he was an Aerotek employee does not create a triable issue of fact; Solis was in a dual employment situation with Aerotek (his general employer) and Clean Harbors (his special employer).

**2. Solis's Injury Falls Within the Scope of the WCA**

The undisputed facts also demonstrate that Solis's injury arose out of and in the course of his employment. "When an employee's injuries are compensable under the Workers' Compensation Act, the right of the employee to recover the benefits provided by the Act is his exclusive remedy against the employer"—or in this case, *employers*. *Eckis v. Sea World Corp.*, 64 Cal. App. 3d 1, 6 (1976) (citing Cal. Lab. Code § 3600); *see Riley*, 203 Cal. App. 3d at 1251 ("[W]hen . . . an employee has both a 'general' and a 'special' employer, the employee is

[8] Solis claims that "the doctrine of promissory estoppel prevents [Clean Harbors] from asserting that it is not Solis's employer after expressly requiring him to sign an agreement stating that he was not." ECF No. 42 at 24 (capitalization omitted). This contention has no factual basis. There is no evidence in the record indicating that Clean Harbors, as opposed to Aerotek, required Solis to sign the Aerotek employment agreement (or any other agreement).

generally limited to a statutory [workers' compensation] remedy for injuries he receives in the course of his employment with the special employer; he may not bring a separate tort action against the special employer."). As relevant here, an injury "arising out of and in the course of the employment" meets the WCA's "conditions of compensation" when, among other things, "at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment." Cal. Lab. Code § 3600(a)(2). "Where a reasonable doubt exists as to whether an act of an employee is contemplated by the employment, or as to whether an injury occurred in the course of the employment, [Cal. Lab. Code] section 3202 requires courts to resolve the doubt *against the right of the employee to sue for civil damages* and in favor of the applicability of the [WCA]." *Eckis*, 64 Cal. App. 3d at 7 (emphasis added).

Solis argues that he "was *not* performing a duty under the scope of his employment" at the time of his injury because, according to Solis, the injury-causing activity—maintenance work on Clean Harbors's machinery—was "a little bit out of [his] job description" as a Field Technician. ECF No. 42 at 18. This argument is unpersuasive. The applicability of the WCA "is not limited to those cases where the injury occurs while the employee is performing the classical duties for which he was originally hired." *Eckis*, 64 Cal. App. 3d at 8. Rather, as the *Eckis* court explained,

> [w]here, as here, an employee is injured on the employer's premises during regular working hours, when the injury occurs while the employee is engaged in an activity which the employer has requested her to undertake, and when the injury-causing activity is of service to the employer and benefits the employer's business, the conditions imposing liability for compensation under [California] Labor Code section 3600 are met as a matter of law, and *it is immaterial that the activity causing the injury was not related to the employee's normal duties* or that the circumstances surrounding the injury were unusual or unique.

*Id.* at 9 (reversing judgment in favor of Sea World employee who was injured while riding a killer whale in a bikini so that her employer could take publicity pictures; rejecting employee's argument that because "her injuries were unrelated to the secretarial duties she was originally hired to perform, . . . her case d[id] not come within the purview of the [WCA]") (emphasis added); *see also Lomibao v. Baxter Healthcare Corp.*, 2013 WL 12138733, at *3 (C.D. Cal. Aug.

5, 2013) (dismissing with prejudice tort claims against employer based on coma-inducing injuries plaintiff sustained when his supervisor ordered him to enter a blood plasma tank to retrieve a fellow technician who had collapsed, which was "not part of his job description"; citing *Eckis* and finding that the employee was "injured during the 'course and scope' of his employment" as he "was engaged in an activity that Defendant requested, which was of service to Defendant, while on Defendant's premises").

Here, it is undisputed that Solis was injured while assisting Clean Harbors employees, at their request, perform maintenance work on Clean Harbors's machinery at Clean Harbors's facility. Even if that maintenance work was "a little bit out of [Solis'] job description" as he claims, it was nonetheless of service to Clean Harbors and benefitted Clean Harbors's business. *See Eckis*, 64 Cal. App. 3d at 9; *see also Wright v. Beverly Fabrics, Inc.*, 95 Cal. App. 4th 346, 356 (2002) ("It is well established that a workman who sustains injury while rendering reasonably needed assistance to a fellow workman in furtherance of the employer's business is considered to have suffered an injury arising out of and in the course of his employment when the act done is within the reasonable contemplation of what the employee may do in the service of his employer.") (citation omitted). These facts establish that Solis's was acting in the course and scope of his employment at the time of his injury. Moreover, Solis "has received the quid pro quo—worker's compensation coverage with attendant quick recovery and simplified procedures—which justifies loss of the right to bring a tort case." *Santa Cruz Poultry*, 194 Cal. App. 3d at 583.

Solis's remaining arguments regarding the inapplicability of the WCA's exclusive remedy rule are without merit. Any emotional distress that he experienced as a result of his workplace injury does not, as Solis argues, escape the reach of the WCA's exclusive remedy rule. *See* ECF No. 42 at 16–19. "The compensation bargain—and thus workers' compensation exclusivity—also encompasses injury 'collateral to or derivative of a compensable workplace injury,' such as emotional distress stemming from the experience of a physical injury at work." *Shirvanyan v. Los Angeles Cmty. Coll. Dist.*, 59 Cal. App. 5th 82, 105 (2020) (internal citation omitted); *see also Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 161–62 (2014) (emphasizing that "even 'severe emotional distress' arising from 'outrageous conduct' that occurred 'at the worksite, in the

United States District Court
Northern District of California

normal course of the employer-employee relationship' is the type of injury that falls within the exclusive province of workers' compensation") (quoting *Miklosy v. Regents of Univ. of California*, 44 Cal. 4th 876, 902 (2008)). As the California Supreme Court has explained, "cases that have permitted recovery in tort for intentional misconduct causing disability have involved conduct of an employer having a 'questionable' relationship to the employment, an injury which did not occur while the employee was performing service incidental to the employment and which would not be viewed as a risk of the employment, or conduct where the employer or insurer stepped out of their proper roles." *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 161 (1987). Nothing in the record supports a finding that such circumstances apply in this negligence action.

Consequently, the Court finds that the WCA's exclusive remedy rule applies and precludes any tort remedy against Clean Harbors or Aerotek.

## III. CONCLUSION

For the reasons set forth above, Aerotek and Clean Harbors are entitled to judgment as a matter of law on Solis's negligence claim. Their motion for summary judgment is granted. A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: May 21, 2021

ALEX G. TSE
United States Magistrate Judge